In re Francisco Navarro Ortiz, Juez de la Corte de Distrito de Mayagüez, querellado.

Núm. 1.—*Sometido:* Mayo 22, 1942. *Resuelto:* Junio 3, 1942.

*Hon. Procurador General George A. Malcolm; Ricardo A. Gómez, Fiscal del Tribunal Supremo, J. Suárez Garriga, Fiscal Especial General y José C. Aponte, Fiscal Auxiliar del Distrito de San Juan, abogados del querellante; F. Navarro Mendín, José Sabater, Oscar Souffront, Miguel A. García Méndez, Gilberto López de Victoria y Celestino Iriarte, abogados del querellado.*

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

El 29 de abril de 1930 el Gobernador de Puerto Rico aprobó la Ley núm. 58 decretada por la Asamblea Legislativa Insular disponiendo que el cargo de juez de las cortes

de distrito de esta Isla sea desempeñado por jueces nombrados por el término de diez años y proveyendo para su nombramiento y destitución (Leyes de 1930, pág. 419).

De acuerdo con lo prescrito en el párrafo segundo de la sección tercera de esa ley, en abril 13, 1942, George A. Malcolm, Procurador General de Puerto Rico, presentó en la secretaría de este tribunal un escrito firmado y jurado por él como querellante, formulando seis cargos contra Francisco Navarro Ortiz, Juez de la Corte de Distrito de Mayagüez y pidiendo a la corte que ordenara a su fiscal la investigación preliminar de los mismos, informándole de su resultado.

Esta corte examinó la querella y ordenó la práctica de la investigación preliminar de ley.

El 28 de abril de 1942, el Procurador General querellante presentó otro escrito firmado y jurado, adicionando los cargos primero y segundo de su querella, y la corte ordenó que la investigación preliminar se extendiera a la adición.

En mayo cuatro siguiente informó el fiscal que había practicado la investigación preliminar que se le ordenara y que, a su juicio, de la misma resultaban probados los cargos formulados. La corte, en mayo 5, 1942, estimando que había méritos suficientes para ello, dispuso que se notificara al Juez Navarro Ortiz de la querella, de los cargos adicionales y del informe del fiscal, y avisó que se reuniría el día veintidós de mayo a las nueve de la mañana y siguientes hábiles para celebrar la vista correspondiente.

Notificado el querellado, archivó su contestación y defensa en mayo 20, 1942, y en mayo 21 el fiscal pidió que se eliminaran de ella ciertos párrafos de la subdivisión (c), cuarto cargo, y sus "defensas especiales."

En el día señalado, hallándose presentes el querellante y el querellado, sus abogados y el fiscal de esta corte, comenzó la investigación. Se oyó a las partes sobre la moción eliminatoria del fiscal y la corte decretó la eliminación del tercer párrafo de la subdivisión (c), cuarto cargo, por inmaterial,

y de las "defensas especiales," por irrelevantes. La vista prosiguió, continuando el 23, sábado, y el 25 y 26, lunes y martes, de mayo, 1942, terminando el 26 con el informe oral por parte del querellante, del fiscal de esta Corte, Sr. Gómez, del Procurador General Sr. Malcolm y del fiscal Aponte, y por parte del querellado, de sus abogados Sres. M. A. García Méndez y José Sabater. Ambas partes estuvieron presentes en todas las sesiones, concediéndoseles hasta el 28 de mayo para presentar, como presentaron, memoranda de autoridades.

Ordena la ley que si después de la debida consideración de las pruebas presentadas, el Tribunal Supremo llegase a la conclusión de que la querella o cualquier parte sustancial de la misma es cierta, adoptará una resolución recomendando al Gobernador la destitución del juez querellado, y a los efectos de cumplir ese deber procederemos al examen de la prueba con respecto a los cargos, por el orden en que fueron formulados.

1. Veamos el primero. Gira alrededor de la conducta del querellado en dos procesos sobre adulteración de leche en los que se alegó la reincidencia de los acusados.

Expresa el querellante que fué inusitado el interés que demostró el querellado en el primero de ellos—*Pueblo* v. *Acosta Padilla* en el que el acusado estuvo representado por el abogado P. N. Colberg—en que se probara la reincidencia, mientras que en el segundo—*Pueblo* v. *Toro Zapata* en el que el acusado estuvo representado por el abogado C. García Méndez—consintió en que se eliminara la alegación de reincidencia, y sostiene que su actuación demuestra negligencia inexcusable en el desempeño de sus funciones como juez, conducta inmoral al preferir unos abogados a otros e ineptitud manifiesta para el ejercicio de su cargo.

El caso del *Pueblo* v. *Acosta* vino a esta corte en apelación. Se alegó como error el hecho de haberse ordenado por el juez la prueba de la reincidencia "a pesar del fiscal no dis-

ponerse a probarla.'' Esta corte desestimó el error. Narró extensamente lo ocurrido según las constancias del récord y dijo finalmente:

''. . . En la acusación se alegaba la reincidencia, expresando el número del caso en que el acusado había sido convicto. Cuando el fiscal trató de probar el hecho de la reincidencia con prueba oral, se opuso la defensa, alegando que la mejor prueba era el libro de sentencias. Fué entonces que la corte ordenó que el libro fuese traído a su presencia, sin que aparezca del récord que la defensa se opusiera o tomara excepción.'' *Pueblo* v. *Acosta,* 56 D.P.R. 138, 140, 142.

La conducta del querellado en dicho caso fué al parecer la de un juez celoso de que la prueba se practicara en su totalidad y en propia forma, llegando en su celo a ayudar al representante del Pueblo en su actuación. La sentencia imponiendo al acusado seis meses de cárcel y quinientos dólares de multa, con revocación de la licencia para vender leche, se dictó el once de febrero de 1939.

En el otro caso, o sea en el del *Pueblo* v. *Toro Zapata,* también por adulteración de leche, la reincidencia se alegó, en la acusación, en los siguientes términos:

''Se alega la reincidencia de este acusado como sigue: El referido acusado, José Toro Zapata, fué acusado en el caso 9047 de esta Corte de Distrito de Mayagüez, P. R., y condenado en 1 de marzo de 1935 a pagar la multa de $25 o a sufrir un día de cárcel por cada dólar que dejase de satisfacer, por un delito de transportar leche de vaca adulterada para consumo humano, sentencia que es firme, cumplió el acusado y no fué apelada.''

La celebración del juicio fué suspendida varias veces. Finalmente el récord demuestra que el dos de marzo de 1939, o sea alrededor de veinte días después de la sentencia en el caso de Acosta, ocurrió lo que sigue:

''Comparece El Pueblo de Puerto Rico por su Fiscal Especial Hon. V. Palés Matós y el acusado en persona y asistido del Lcdo. C. García Méndez, éste en sustitucióón del Lcdo. P. N. Colberg que es el abogado del acusado, para la vista de este caso.

"El Fiscal solicita permiso de la corte para eliminar de la acusación la alegación de reincidencia y la corte ordena la eliminación solicitada.

"El acusado por medio de su abogado hace alegación de culpable del delito que se le imputa.

"La corte declara al acusado José Toro Zapata culpable y convicto de un delito de tener en su poder y posesión, transportar, conducir y ofrecer en venta con el fin de dedicarla al consumo humano leche de vaca adulterada y dicta sentencia condenándolo a pagar veinticinco dólares de multa o en su defecto a sufrir un día de cárcel por cada dólar que dejare de satisfacer abonándosele el tiempo que haya estado preso por esta misma causa y al pago de las costas."

Es cierto que dentro de nuestro sistema acusatorio es el fiscal el que tiene el control de sus asuntos, pero aquí la acusación había sido ya formulada con la alegación de reincidencia y el fiscal para eliminarla solicitó el permiso de la corte y la corte que tan celosamente había actuado días antes en un caso similar, decretó la eliminación acto seguido sin que del récord conste que inquiriera siquiera el fundamento de la petición del fiscal, llamando inevitablemente la atención además que eso ocurriera cuando el abogado de Toro Zapata que era el mismo que representó a Acosta Padilla, fué sustituído.

El querellado ha tratado de explicar la eliminación de la reincidencia en el sentido de haberse hecho porque así procedía de acuerdo con la ley, ya que en la acusación pendiente se imputaba a Toro Zapata que "tenía en su poder y posesión, transportaba, conducía y ofrecía en venta, con el fin de dedicarla al consumo humano, leche de vaca adulterada" y en la anterior por la cual fué condenado, sólo se le imputó que "transportaba, con el fin de dedicarla al consumo humano, leche de vaca adulterada."

La explicación no es aceptable. La primera acusación imputaba la comisión del delito por el cual fué condenado el acusado, adulteración de leche, en una de sus modalidades, transportar leche adulterada para el consumo humano, y la

pendiente imputaba al mismo acusado el mismo delito en la misma modalidad y en otras. La alegación de reincidencia estuvo, pues, bien formulada de acuerdo con la ley y la jurisprudencia. Ley núm. 77 proveyendo lo necesario para castigar la adulteración de leche y para otros fines, aprobada en agosto 12, 1925, pág. 559; *Martínez* v. *People of Porto Rico,* 46 F. (2d) 427, y *Pueblo* v. *Cotis,* 50 D.P.R. 484, en que quedó resuelto que "el transporte de leche adulterada para el consumo humano es constitutivo de delito de acuerdo con la ley aunque la persona que la transporte no sea la que verificó la adulteración."

Como adición al primer cargo, se formularon cuatro más en relación (*a*) con la aprobación de cierta escritura de adopción; (*b*) con una declaratoria de herederos; (*c*) con el *ab intestato* de Inés Rivera Irizarri; y (*d*) con ciertas renovaciones de licencias para portar armas.

(*a*) Sostiene el querellante que el querellado demostró incapacidad y negligencia manifiesta como juez al aprobar la escritura de adopción en el caso Civil núm. 2967, Dr. Nelson Perea Fernández, porque lo hizo sin recibir prueba documental de la edad de los adoptantes, sin informe escrito del fiscal y sin unirse al expediente el récord taquigráfico de la vista.

Contestó el querellado que no era necesaria prueba documental de la edad de la esposa del adoptante, que tuvo ante sí prueba fehaciente de la edad del adoptante Dr. Perea, que no se necesita informe escrito del fiscal y que la aprobación se otorgó de acuerdo con la ley.

El expediente introducido en evidencia por el querellante se compone del escrito inicial presentado por medio del abogado C. García Méndez en noviembre 25, 1940; del certificado de nacimiento de Francisco José Orta el 7 de junio de 1940, hijo de Flor de Luz Orta, de diez y siete años de edad, natural de Mayagüez; de la resolución aprobatoria, cuyo segundo por cuanto dice: "*Por cuanto:* Examinada la prueba documental presentada, consistente en copia certificada de

dicha escritura y certificación literal del nacimiento de dicho menor adoptado, y vista asimismo la prueba testifical ofrecida en el acto de la vista de este caso, aparece que se ha cumplido con todas las formalidades de ley que el caso requiere;'' de copia de una minuta haciendo constar que se practicó prueba documental y testifical el 27 de noviembre de 1940, y de un escrito solicitando el desglose y entrega de la escritura de adopción para anotarla en el Registro Demográfico, que se proveyó de conformidad.

El querellado presentó en evidencia copia de la escritura de adopción y copia del récord expedida en mayo 8, 1942. En el récord aparecen las declaraciones del doctor Perea, de Flor de Luz Orta y de Gil Orta, y consta del mismo que el abogado del promovente hizo referencia a la escritura de adopción y a la certificación de nacimiento unidas al expediente, y el juez dijo:

"Aceptadas en evidencia. Que se una al expediente el récord taquigráfico de las declaraciones prestadas y pase al Fiscal para su informe, después de lo cual se redactará una resolución, declarando a este niño hijo adoptivo del Dr. Nelson Perea y de Joaquina Ferrer Vera, para que ese niño goce en lo sucesivo de todos los derechos legales prescritos en el Código Civil.''

Resulta en tal virtud comprobado que el récord taquigráfico nunca se unió al expediente, que no se aportó la mejor prueba en relación con la edad del adoptante y que el fiscal no fué oído como la propia corte ordenó.

(b) Alega el querellante que el querellado demostró incompetencia como juez en la tramitación de la declaratoria de herederos de Juana Fantauzzi, Civil núm. 1969, de la Corte de Distrito de Mayagüez.

Del expediente que introdujo en evidencia aparece que la solicitud inicial se presentó por medio del abogado A. Ramírez Silva, en julio 24, 1939, pidiéndose la declaratoria de herederos a favor de dos hermanos; que en agosto 4 siguiente se practicó prueba ante el juez especial Sr. Sabater quien

llamó la atención al abogado sobre la publicación de edictos; que en agosto 21, 1939, se unió al expediente una declaración jurada de la promovente asegurando que el valor de la herencia no excedía de mil dólares y que el 21 de diciembre del propio año se dictó la resolución final declarando herederos de su hermana Juana Fantauzzi a Ciprián Fantauzzi y a la promovente. Dicha resolución aparece firmada por el querellado como juez de distrito.

En su contestación alegó el querellado que el asunto se tramitó de acuerdo con la ley y declarando en la vista explicó que el caso le fué sometido en cámara por el abogado de la promovente cuando cesó el juez especial y él se reintegró a la misma y que no ordenó la publicación de edictos por tratarse de una herencia el valor de cuyos bienes no excedía de mil dólares. Declaró el abogado de la promovente y corroboró lo dicho por el juez.

La informalidad que se advierte es que el asunto debió someterse al juez querellado por escrito y no verbalmente. En cuanto a los edictos era discrecional en el juez ordenar o no su publicación.

(c) El querellante imputa al querellado ineptitud, negligencia y favoritismo al declarar herederos a determinadas personas sin tener ante sí las certificaciones de su nacimiento, que se unieron al expediente después de dictada la resolución.

De los autos originales del caso civil núm. 1268, *ab intestato* de Inés Rivera Irizarry, resulta que el asunto se promovió por Francisco Rivera Irizarry por medio de su abogado C. García Méndez en julio 13, 1938, pidiendo que se declararan herederos de doña Inés Rivera, fallecida en Ponce, radicando sus bienes en San Germán, a sus menores hijos Amelia, Gladys y Héctor y a su viudo y que en julio 22 se practicó prueba documental y testifical. Al final del acto dijo el abogado del promovente:

". . . vamos a solicitar que quede el caso abierto para prueba en cuanto a las certificaciones de nacimiento de dos de los hijos, porque resulta que nacieron en Estados Unidos y no las tenemos."

Y el juez querellado resolvió:

"Admitida la prueba documental ofrecida y se marcan Exhibits 'A' y 'B' del peticionario, quedando el caso abierto para presentar la prueba documental que falta, después de lo cual, que se una al expediente el récord taquigráfico de las declaraciones prestadas, y que se formule un proyecto de resolución y la corte resolverá."

Así las cosas, en el propio mes de julio, sin que se hubiera presentado la prueba documental que faltaba, que no fué obtenida en Nueva York hasta agosto 8, siguiente, el juez querellado decretó la declaración de herederos solicitada. El segundo por cuanto de dicha resolución, copiado a la letra, dice:

*"Por cuanto:* Se acompañaron a dicha solicitud los documentos correspondientes, y habiéndose señalado día para la vista en corte abierta de dicha solicitud, se practicó la prueba testifical ofrecida consistente en la declaración de dos testigos, y quedaron comprobados los hechos todos de la solicitud; y habiendo estado presente en dicha vista el Fiscal del Distrito éste manifestó no tener oposición alguna que hacer a lo solicitado, sin que tampoco hubiera oposición de parte otra alguna, y habiéndose observado en esta tramitación todos los requisitos de ley."

La contestación del querellado a esta adición al primer cargo consistió en que antes de dictar su resolución de julio 29, 1938, tuvo ante sí certificaciones de nacimiento de las herederas Gladys y Amelia Rivera, pero encontrándolas deficientes, recomendó al abogado del peticionario la obtención de certificaciones enmendadas y en que no eran necesarias las certificaciones, pudiendo en su discreción basar su declaración en la prueba testifical practicada. En la vista el juez declaró en el mismo sentido de la contestación. A una pregunta del Juez Asociado Sr. De Jesús sobre si las certificaciones imperfectas se unieron a los autos, contestó: "El abogado se las llevó para mandarlas a Nueva York."

Queda en pie el hecho de haberse decidido el asunto sin tener el juez a la vista la mejor prueba para presentar la cual quedó expresamente abierto el asunto. Además, hemos visto que en el por cuanto de la resolución transcrito se hace constar ''y habiendo estado presente en dicha vista el fiscal de distrito éste manifestó no tener oposición alguna que hacer a lo solicitado.'' Sin embargo ni del récord taquigráfico ni de ninguna otra parte de los autos aparece lo manifestado por el fiscal, ni siquiera que estuviera presente en el acto de la vista.

(d) Este último cargo adicional al primer cargo abarca tres actuaciones del juez querellado en tres renovaciones de licencias para portar armas, que el querellante sostiene que revelan favoritismo al bufete profesional del Lic. M. A. García Méndez.

Se alega que en febrero 13, 1939, en el expediente Civil núm. 17473, Dr. Enrique Lassise, renovación licencia portar armas, se pidió una renovación; que se celebró una vista en marzo 10, 1939, y en marzo 27, 1939, el juez querellado concedió el permiso, sin que el fiscal informase, no obstante haberlo así ordenado el propio juez, y que igual sucedió en el expediente Civil núm. 17781, José Ramón Flores, y en el Civil núm. 17452, Delfín Rodríguez Carlo, en todos los cuales los peticionarios estuvieron representados por la oficina de García Méndez.

Para probar el cargo el querellante presentó los tres expedientes. Se iniciaron en 1934. En 1939 comparecieron los peticionarios por su indicada representación y pidieron la renovación de la licencia. El juez querellado ordenó la práctica de prueba, y practicada, mandó que el récord taquigráfico se uniera al expediente de cada uno y que pasara el caso al fiscal para su examen e informe y en todos dictó resolución final haciendo constar en ella lo que sigue: ''y vista la conformidad del Ministerio Fiscal''. Aparecen unidos a los expedientes el récord taquigráfico de la prueba y los edictos publicados pero no los dictámenes del fiscal.

En su contestación negó el querellado haber dictado las resoluciones de que se trata sin que el fiscal informara y alegó que si los informes no aparecen en los autos "tendrían que haber sido separados maliciosamente de los records de dichos casos." En el acto de la vista declaró el querellado que en ningún caso de renovación tramitado ante él como juez actuó sin la previa publicación de edictos, sin el informe del fiscal y sin prueba "porque acaso el peticionario ha variado en su conducta," y que no obstante haberse decidido por esta Corte Suprema que cuando el fiscal asiste a la corte no es necesario su informe escrito, él siempre lo ha exigido para constancia en los autos.

Quedó en pie el hecho de que los dictámenes del fiscal no aparecen en los autos que fueron entregados por el secretario de la corte a los fiscales foliados, y que igualmente foliados se introdujeron en evidencia. Quizá pudieron extraviarse en secretaría, pero llama la atención que sucediera lo mismo con los tres.

2. Pasaremos al estudio del segundo cargo. Por él sostiene el querellante que el juez querellado demostró manifiesta ineptitud y negligencia inexcusable al resolver el caso de hábeas corpus, civil núm. 3065, *Julio López* v. *Camelia Rodríguez,* basándose en prueba que nunca se practicó en el mismo, siendo inmoral su conducta y cometiendo un delito al alterar de su puño y letra los autos, especialmente en la transcripción de la minuta del 27 de enero de 1941, para conformarla maliciosamente a la sentencia dictada el 13 de marzo de 1941.

La contestación en resumen sostiene que el caso de hábeas corpus quedó sometido al juez querellado para su decisión el 24 de enero de 1941; que habiéndose practicado prueba en un incidente del pleito de divorcio existente entre las mismas partes del caso de hábeas corpus, partió involuntariamente de la impresión errónea de haberlo sido en el hábeas corpus y a ella se refirió en su opinión, enmendando la transcrip-

ción de la minuta que figuraba en los autos, creyendo que ése era su deber; que bien pudo llegar a la misma conclusión a que llegó en su sentencia declarando el hábeas corpus sin lugar, sin referirse a prueba alguna, porque cuando le fué sometido el 27 de enero, hacía cuatro días que se había iniciado el pleito de divorcio y el artículo 98 del Código Civil ordena que los hijos del matrimonio se pongan bajo el cuidado de la mujer mientras el pleito se sustancia y decide, salvo razones poderosas en contrario, y que prueba su buena fe el hecho de haber dejado sin efecto su sentencia y el de que sometido el caso de nuevo al juez de distrito *at large* Sr. Massari, volvió a resolverlo declarando la demanda sin lugar.

Se admite la existencia de los casos de hábeas corpus y divorcio. También que la vista del hábeas corpus que estaba señalada para enero 24, 1941, se transfirió para el 27, fecha en que se había ya radicado el divorcio.

No está de acuerdo la evidencia en cuanto a si el 27 de enero, 1941, el caso de hábeas corpus quedó o no sometido a la decisión de la corte. La minuta como fué redactada primeramente dice que quedó y así lo afirmó el secretario de la corte Pascual Frank Paganacci. Por el contrario, el abogado del demandante, E. Báez García, sostuvo en su declaración que el hábeas corpus quedó pendiente y que sólo se discutió el efecto que tendría sobre él la radicación del pleito de divorcio. Las notas tomadas de lo ocurrido en corte abierta por Rosa María Sánchez que actuaba ese día como taquígrafa oficial, corroboran la declaración de Báez y en cierto modo también la corrobora lo declarado por el abogado Charneco de la demandada en el hábeas corpus y demandante en el divorcio. Nos inclinamos a resolver el conflicto en el sentido de que el hábeas corpus no quedó sometido a la decisión del juez.

Son hechos también admitidos que el hábeas corpus se decidió por sentencia de 13 de marzo de 1941 fundada en

una opinión en la que se hace referencia a prueba practicada que nunca se practicó, y que la minuta de lo ocurrido el 27 de enero, 1941, fué alterada por el juez agregando de su puño y letra "y practicada prueba de ambas partes," pero la evidencia es contradictoria en cuanto al último en lo que se refiere a la fecha en que se verificó la alteración, pues mientras el juez y el secretario dijeron que lo fué el propio trece de marzo en que se dictó la sentencia, Báez García sostuvo enfáticamente que se hizo después de su conversación con el juez cuando fué en busca del abogado de la parte contraria. Había visto poco antes la minuta sin la alteración y a su regreso la encontró hecha con la tinta fresca todavía.

Y son hechos también admitidos que dentro del divorcio, en el incidente sobre alimentos provisionales, después del 27 de enero pero antes del 13 de marzo, 1941, se practicó prueba, y que según la minuta de marzo 21, 1941, copia de la cual está en los autos del caso de hábeas corpus, la corte dejó sin efecto la sentencia del trece "por haberse incurrido en un error involuntario."

Este cargo es serio en verdad. Aun cuando se acepte que el juez no actuara con dañada intención, tiene que concluirse que fué negligente en grado sumo en el examen de los records o que su cerebro no funcionó correctamente al resolver el hábeas corpus emitiendo una larga opinión en la que no sólo se dice que se practicó evidencia si que se hace referencia a ella, cuando es lo cierto que jamás fué practicada. El hecho de haberse oído prueba en el incidente de alimentos, tiende a explicar lo ocurrido, pero la explicación no puede aceptarse como satisfactoria.

Y eso no es todo. Lo que completa el cargo y lo agrava, es la reacción del juez que cuando el abogado de una de las partes le llama la atención sobre lo ocurrido, sostiene lo hecho y para probarlo, mientras dicho abogado va en busca del de la parte contraria, altera personalmente la minuta haciendo aparecer como cierto algo cuya falsedad no podía ya dejar

de constarle. Esa reacción frente al error, constituye conducta inmoral incompatible con la que debe seguir un hombre a quien se encomienda la misión de administrar justicia.

A este segundo cargo adicionó dos más el querellante, que marcó con las letras (a) y (b).

(a) Consistió el cargo adicionado en haber condenado el juez querellado a Juan Torres Valentín como autor de un delito de portar armas sin que existiera contra él formulada acusación alguna por tal delito.

Alega el querellante que ello demuestra incapacidad y negligencia por parte del querellado en el desempeño de sus funciones oficiales y poco celo por los derechos y la libertad ciudadana. Sustanció el cargo por medio de prueba documental.

Aceptó el querellado en su contestación la ocurrencia de los hechos, pero negó que revelaran incapacidad, negligencia y falta de celo, explicando que se debieron a lo que sucede rutinariamente en casos de asesinato y portar armas, al cúmulo enorme de trabajo y a la necesidad de dar atención a innúmeros asuntos criminales y civiles, especialmente en las sesiones de la mañana. Llamó a declarar a uno de los abogados que intervino, Pascasio Fajardo Martínez, quien se expresó así:

"P. ¿Recuerda usted, compañero, haber tenido que intervenir como abogado conjuntamente con el Licenciado Pedro Baigés Gómez, en el caso de asesinato contra Juan Torres Valentín, caso que se celebró en la Corte de Distrito de Mayagüez, presidida por el Juez Hon. Francisco Navarro Ortiz allá para el 31 de enero de 1939?

"R. Fuí uno de sus abogados.

"P. ¿Recuerda usted, compañero, si después de dictado veredicto de homicidio en dicho caso se realizó algún acto por usted y el compañero Baigés Gómez y el Fiscal Interino, si se realizó alguno en ese día?

"R. Voy a explicar. El juicio principió. Se vió la prueba de cargo. La prueba de cargo no fué todo lo fuerte que el Fiscal creyó que era y entonces transigimos con él en el sentido de que él se allanaba a que nosotros lo declarásemos culpable de homicidio volun-

tario; y así lo hicimos. Entonces el Hon. Juez señaló fecha para dictar la sentencia y en esos momentos el ministerio público, o sea el Fiscal, dice: 'Bueno, queda pendiente un *misdemeanor.*' Y nosotros, sin darnos cuenta, tal vez guiados porque en los autos había una fianza por un delito de misdemeanor y tal vez porque dada la experiencia nuestra siempre sabemos que en todos estos casos se acusa por el misdemeanor y por el delito *felony,* pues dijimos: 'No hay inconveniente. Lo declaramos culpable también y solicitamos que se posponga dictar la sentencia para el mismo día del caso felony.' Así lo hizo el tribunal.

＊　　＊　　＊　　＊　　＊　　＊　　＊

"P. Después de eso, ¿que pasó, si pasó algo?

"R. Pues un día o dos antes de la hora de la sentencia, estudiando el caso, vemos que no existía tal denuncia de misdemeanor. Vamos donde el Fiscal y le dijimos: 'Bueno, ¿dónde está la denuncia del misdemeanor?' Dice, 'Caramba, no está.' Entonces la formuló y la radicó y nosotros, como habíamos declarado al acusado culpable de un misdemeanor, entonces, no recuerdo si por escrito u oralmente, fuimos donde el juez y le explicamos la situación, le dijimos nuestra responsabilidad y le pedimos que nos exonerara de la declaración de culpabilidad; y así lo hizo, y entonces nosotros presentamos una moción pidiendo el sobreseimiento por prescripción de esa denuncia, ya que había transcurrido más de un año.

"P. ¿Hizo alguna rectificación el juez cuando le enteraron de lo que había sucedido y solicitaron reconsideración?

"R. Resolvió ambas cuestiones a nuestro favor, o sea exonerarnos de la alegación de culpabilidad y luego declarar sin lugar la radicación por el Fiscal de la denuncia y ordenar el sobreseimiento y archivo del caso.

"P. ¿Recibió algún perjuicio el representado de ustedes o alguna sentencia adicional a la impuesta de culpabilidad del homicidio?

"R. No, señor."

No hubo perjuicio para el acusado pero sí revela lo ocurrido una situación de records y actos tales en la corte que preside y dirige el querellado que es contraria a su debido funcionamiento. Apenas puede comprenderse cómo en una corte de récord pueda ocurrir un hecho semejante. Y el mayor responsable es siempre el que ocupa el puesto más alto, en este caso el juez querellado.

(*b*) Alega el querellante que el querellado demostró manifiesta ineptitud al designar los Comisionados de Jurados para 1942–1943, eligiendo entre ellos uno a sabiendas de que había actuado como comisionado el año anterior.

El cargo fué sustanciado por evidencia documental. De ella resulta que el juez querellado el primero de abril último designó Comisionado de Jurado por el pueblo de Añasco a Leovaldo E. Pijuán, que había servido como tal el año anterior, hecho que lo imposibilitaba para actuar en éste. Así las cosas, el 21 del propio mes de abril dictó resolución haciendo constar el hecho como error involuntario y sustituyendo a Pijuán por José Francisco Rodríguez.

En su contestación aceptó lo ocurrido el querellado pero negó que nombrara a Pijuán a sabiendas de que había actuado en el año anterior. En el juicio declaró explicando lo ocurrido.

No revela el cargo desconocimiento de la ley que fué leída en lo pertinente por el propio juez en los procedimientos que tuvieron lugar en corte abierta, pero sí descuido en su aplicación en la práctica.

3. Por el cargo tercero sostiene el querellante que el juez querellado incurrió en negligencia inexcusable al no dictar sentencia dentro de las veinticuatro horas de ley en los casos criminales números 10,800 y 10,801 por portar armas y no inscripción de armas seguidos contra Luis Peláez, que se vieron del 21 al 23 de enero de 1941 por la misma prueba practicada en el número 10,799 seguido por asesinato contra el mismo acusado; que en el propio asunto incurrió el querellado en conducta inmoral e impropia de un magistrado al dictar una minuta en marzo 15, 1941, haciendo constar hechos falsos como ocurridos en enero 24, 1941, constituyendo además dicho acto una intromisión por su parte en las funciones del secretario de la corte demostrativa de ineptitud.

Como prueba introdujo el querellante los autos originales en las causas de asesinato (10,799), portar armas (10,800)

y no registro de armas (10,801), los de los recursos de *certiorari* (1262) y *mandamus* (365) tramitados ante esta Corte Suprema, el récord taquigráfico de la sesión de la noche del 23 de enero, 1941, en la causa de asesinato y el de las vistas en las causas por portar armas y no registro de armas y un libro de minutas. Y llamó a declarar a M. A. García Méndez y V. Palés Matos.

Son hechos indiscutibles e indiscutidos los relativos a la existencia de las tres causas criminales contra Peláez a que hemos venido refiriéndonos y el de que las de portar armas y no registro de armas se sometieron a la corte presidida por el juez querellado por la prueba a practicarse, como se practicó en efecto del 21 al 23 de enero, 1941, en la de asesinato; que no hubo veredicto en la de asesinato y no se dictó sentencia en las de portar armas y no registro de armas dentro de las veinticuatro horas de terminada la práctica de la prueba y que cerca de dos meses después, el 15 de marzo de 1941, el juez querellado dictó la siguiente minuta que el secretario de la corte registró a los folios 47 y 48 del Libro de Minutas núm. 152:

"En los casos criminales números 10,800, por un delito de Portar Armas y 10,801 por Infracción al artículo 7 de la Ley Núm. 14 de 8 de julio de 1936, enmendada, se hace constar que estos casos estaban condicionados a la vista y prueba del caso felony Núm. 10,799 contra el mismo acusado por un delito de asesinato.

"Se celebró el juicio por asesinato el día 23 de enero de 1941 en que comparecieron las partes por sus respectivos abogados y el Pueblo de P. R. por su Fiscal General, y retirado el Jurado a deliberar como a la una de la madrugada del día 24 de enero 1941, compareció el Jurado a sala manifestando que ni estando reunidos por el término de 15 días podrían rendir un veredicto, a razón por la cual la corte disolvió el Jurado.

"No encontrándose ninguno de los abogados del acusado en sala, la corte se abstuvo de dictar sentencia contra el acusado por los casos de Portar Armas y Registro de Armas, a la mañana siguiente se solicitó de los abogados de dicho acusado, V. Palés Matos y Carlos García Méndez, que si deseaban continuar dejando los casos misdemeanor

condicionados a ser resueltos conjuntamente con el felony cuando hubiese veredicto, debían presentar una moción en cada uno de los casos misdemeanor a que se refiere la presente minuta, aceptaron la condición de que los misdemeanors quedaran para ser resueltos cuando se resolviera el felony contra el acusado; y ofrecieron presentar dicha moción sin que hasta el día de hoy la hayan radicado en los expedientes sobre portar armas y registro de armas.

"En tal virtud, y aceptada por la corte la condición de que estos dos misdemeanors se resuelvan cuando sea resuelto el felony, quedan los mismos pendientes hasta que en otro señalamiento así se haga contra el acusado Luis Peláez."

El querellante afirma que es falso que la sentencia en los misdemeanors dejara de dictarse en la noche del 23 de enero de 1941 por no encontrarse en sala ninguno de los abogados del acusado y que a la mañana siguiente los abogados C. García Méndez y V. Palés Matos consintieran en que dichos misdemeanors continuaran condicionados a ser resueltos cuando se resolviera el felony. El querellado sostuvo que los hechos ocurrieron en la forma narrada en la minuta.

Hemos examinado y pesado toda la evidencia aportada y tenemos el convencimiento de que no es cierto que las sentencias en los misdemeanors (portar armas y no registro, de armas) dejaran de dictarse porque no estuviera en sala ninguno de los abogados del acusado y que tampoco es cierto que al día siguiente los abogados del acusado aceptaran la condición de que los misdemeanors quedaran para ser resueltos cuando se resolviera el felony (asesinato) contra el acusado, como consignó el juez en la minuta de marzo 15, 1941.

Del récord taquigráfico de lo ocurrido en la sesión de la noche de enero 23, 1941, al disolverse el jurado que actuó en el felony, consta que el "Abogado Sr. Américo Seda", intervino y dijo: "Señor juez, yo solicitaría que dándole un tiempo razonable a los señores del jurado, me parece que ellos podrían, considerando la prueba y analizándola nuevamente, ponerse de acuerdo sobre su veredicto" y no obstante consignar el juez querellado en su contestación que Seda "no

era parte del 'staff' de abogados de Peláez," hecho que "era de conocimiento personal del juez querellado," admitió sin observación alguna su intervención en el caso en la indicada forma.

Pero aunque se aceptare que Seda no era uno de los abogados de récord, resulta tan claro del resto de la evidencia que no fué por la falta de abogado que se dejó de dictar sentencia, que llegaríamos siempre a la misma conclusión.

Parece conveniente hacer referencia a lo declarado ante esta corte por M. A. García Méndez y V. Palés Matos, abogados de récord en el caso de Peláez.

El Sr. García Méndez, tras una serie de contestaciones evasivas, respondió como sigue:

"P. ¿Es que no puede contestar si es cierto lo que se dice en esa minuta? Usted me contesta que no sabe si son ciertos.

"R. En lo que dice aquí no he participado directamente, luego se me contó a mí y entonces yo me negué a aceptar eso como *leading lawyer* del càso.

"P. ¿Se negó a aceptarlo porque no era verdad?

"R. No porque no fuera verdad, sino porque cuando el Lic. Palés Matos me dijo que el juez había llamado por teléfono al día siguiente para que radicara una moción y dijo que no había inconveniente. Cuando yo llegué de Estados Unidos y el Lic. Palés Matos fué a hablarme del asunto le dije: 'De ningún modo, si el caso *El Pueblo* v. *Acosta* fué resuelto en el sentido de que había que archivar el caso.' Entonces él me llamó y dijo que por su parte no había inconveniente. Yo le llamé la atención también a que había que archivar, de acuerdo con el caso de *El Pueblo* v. *Corretjer*, que está resuelto que tiene que archivarse. Esa es mi posición en el caso. Porque ya fuera porque el abogado le contestara que por su parte no había inconveniente, cosa que no podía aprobar como leading lawyer porque no podía renunciar un derecho de mi defendido, o ya sea porque aun cuando él hubiera estado conforme, tomando en cuenta que yo tenía el derecho a pedir el archivo a base de lo decidido en el caso de *El Pueblo* v. *Corretjer*.

"P. ¿En ningún sitio, Sr. García Méndez, usted ha asegurado o ha dicho que ninguno de los abogados consintió en que se pospusiera la dictadura de la sentencia en ese caso?

"R. Lo que he dicho es que dentro de las 48 horas subsiguientes a la vista del caso de asesinato ni este abogado ni ninguno de los abogados de la defensa compareció ante esta corte, por lo cual quise sostener que no había radicado ninguno de ellos moción alguna renunciando al derecho del acusado a pedir el archivo del caso. Que la estipulación era la única que constaba en autos, o sea la estipulación original. No he dicho que no fuera cierto lo que le dijo Palés al juez o lo que el juez le dijo a Palés. No comparecimos dentro de las 48 horas porque la cuestión de derecho era ésa exclusivamente."

Y Palés manifestó:

"R. ... Quiero explicarme porque de otro modo la respuesta no dará una clara visión de la verdad de los hechos. Con un sí o un no no se responde nada. Al día siguiente de la vista de los felonies el juez de la corte de distrito, que no había dictado sentencia, como era su deber y nuestro criterio, en los misdemeanors, me llamó por teléfono a mi oficina a mí y me dijo que si queríamos que los misdemeanors continuaran siguiendo la vida del felony, que hiciéramos una moción para ello conviniendo eso. Y me decía que se lo dijera también al compañero Carlos García Méndez y a los otros compañeros míos. 'Bueno,' yo le dije, 'Juez, por nuestra parte no hay inconveniente ninguno en que así se haga. Pero eso es una cosa que hay que acordarla con el leading lawyer, Lic. Miguel Angel García Méndez, y yo tengo que verlo.' Y eso quedó así.

"P. ¿De manera que usted no convino con él nada?
"R. No."

Estamos inclinados a creer que ni siquiera hubo conversación alguna entre el juez y el abogado Palés en enero 24, 1941, pero aunque la hubiera habido en los términos explicados por Palés, ¿qué base tuvo en ella el juez querellado para dictar la minuta de marzo 17, 1941? Ninguna cierta en verdad.

El cargo es grave. Puede un juez dejar de cumplir un deber por un olvido involuntario, sin dañada intención. Todos los cerebros tienen un límite de resistencia. Tras un juicio por asesinato que dura varios días y que termina por la noche con la disolución del jurado que no llega a un veredicto, se concibe que un juez a quien ni el fiscal ni la de-

fensa llaman la atención, olvide cumplir con el deber de resolver por sentencia dos casos por delitos menos graves que le fueron sometidos por la prueba practicada en el de asesinato, pero lo que es incompatible con una serena y firme conciencia judicial es recurrir a conversaciones telefónicas con los abogados del acusado, si es que se recurre, y darles un alcance que no tuvieron, o imaginarlas por completo o fijarles una fecha falsa para redactar cerca de dos meses después una minuta que se ordena incluir en el libro oficial de la corte a fin de salvar la falta cometida. Un juez que de tal modo procede, se conduce en forma contraria a la ley y a la moral.

4. Por el cuarto cargo sostiene el querellante que las manifestaciones que transcribe hechas por el juez querellado en las causas criminales núms. 12,114, *Pueblo* v. *Dalmáu y otros,* por violación; 10,799, *Pueblo* v. *Peláez,* por asesinato, y 11,898, *Pueblo* v. *Toro Ortiz,* por asesinato, constituyen conducta inmoral e impropia de un magistrado y que su resolución negándose a excusar al jurado Ruperto Santos también constituye conducta inmoral e impropia de un magistrado que pone en peligro una buena y sana administración de la justicia e invita a que el jurado entre en polémicas con el fiscal, tratando de crear prejuicios en contra del mismo.

En su contestación sostiene el querellado que actuó en los indicados casos debidamente. Dice que sus manifestaciones no se transcriben completas en la querella. Alega que el jurado no excusado intervino en tres casos en que actuó el Fiscal Suárez Garriga y hubo veredicto condenatorio y que el fiscal no lo recusó motivada ni perentoriamente, y expone que el Fiscal Fornaris cuando hizo las manifestaciones que dieron lugar a las suyas se encontraba en completo estado de embriaguez.

La evidencia del querellante con respecto a este cargo fué documental, consistente en récords de las causas criminales indicadas; la del querellado,. testifical. *En rebuttal*

declararon por el querellante el.Fiscal Fornaris y otros testigos.

Sea cual fuere el estado en que se encontrara el Fiscal Fornaris cuando mostró su inconformidad con el veredicto absolutorio que el jurado rindiera en el caso de asesinato de que se trata y por duras que pudieran resultar sus apreciaciones, es lo cierto que examinadas las manifestaciones del juez querellado en sí mismas encuéntranse en ellas algunas que revelan no al guía firme, seguro, que muestra el único camino a seguir, el del cumplimiento del deber, sino al que no pudiendo concebir la grandeza de su misión o que pudiendo concebirla no tiene dentro de sí la fuerza moral bastante para ponerse a su altura, se aviene a cualquier situación y la acepta y la explica y llega hasta el halago cuando la censura procede.

Es cierto que puede cometerse una injusticia cuando se entresaca un párrafo de una serie de manifestaciones que constituyen una integridad y se pone todo el énfasis en él sin tomar en consideración los otros, pero cuando estudiada la totalidad de unas manifestaciones se concluye que en uno de sus párrafos queda la sustancia de las mismas o cuando de alguna manera se advierte que el espíritu del que las hizo se refleja, queriéndolo o sin quererlo, en una parte de ellas, el párrafo o la parte pueden invocarse en un caso como éste para juzgar la personalidad del autor.

Y ciertamente que no está en armonía con la misión que se le encomendara la personalidad de un juez como el querellado que dirigiéndose a jurados que fueron criticados por un fiscal, reconociendo el propio juez que el veredicto que rindieron y que motivó la crítica no era el que procedía .de acuerdo con la prueba, como sucedió en este caso, después de alabanzas exageradas, queriendo a su juicio aminorar el mal efecto que había producido la actitud del fiscal, a fin de conciliar intereses, les dice:

"De modo que esta corte respeta los veredictos del Jurado. Ellos son absolutos; y con la facultad que tiene el Jurado para condenar o absolver a un acusado, no nos podemos meter. La prueba está que un veredicto se rinde a cualquier hora, no importa los fundamentos que haya tenido el Jurado, y si ese veredicto es absolutorio, el acusado queda libre desde ese momento."

Y el juicio que así se forma se robustece cuando ese propio juez al disolver un jurado que le manifestó que no podía llegar a un acuerdo, en otro caso de asesinato, innecesariamente dice:

"El Jurado, señores, son los jueces de hecho, los amos en la apreciación de la prueba, y la decisión de ustedes será sostenida por esta corte mientras yo sea juez de ella y tengo plena confianza en que ustedes al comparecer a la corte así lo expresarán, no solamente por conducto de su Presidente, sino por cada uno de sus miembros. La corte está gustosa de que estos Miembros del Jurado sean decididos, sean honrados, como caballeros y como hombres honestos de este distrito y el que quería absolver ha expresado su opinión franca y sincera de que debía absolver al acusado y el que creía que debía condenarlo ha expuesto también su opinión franca y valiente de que él no podía absolverlo y esto le hace honor tanto a unos como a otros, y la corte se complace en este momento en rendir una felicitación al jurado. La corte disuelve el jurado y señala este caso para verse en el próximo término de lo criminal, para ser visto y juzgado por ante jurado. Muchas gracias por el servicio que han prestado a la justicia en el Distrito de Mayagüez."

En cuanto a la no excusa del jurado, hemos examinado la evidencia y pesado las circunstancias que concurren y no encontramos que la conducta del juez fuera ilegal o incorrecta.

5. Resta sólo considerar el quinto cargo que es de naturaleza distinta a los que dejamos expuestos y juzgados. Por él se coloca al juez querellado fuera de la corte, en el restaurante "La Greca" de la ciudad de Mayagüez, realizando actos que el querellante alega que demuestran conducta inmoral e impropia de un juez.

La evidencia presentada por el querellante para sustanciar el cargo fué toda testifical; la aportada por el querellado, documental, consistente en la copia de un informe confidencial de la policía remitido por el Fiscal General al del Distrito de Mayagüez, y testifical.

Sobre el hecho de que se había anunciado para la noche del diez de diciembre de 1941, en Mayagüez, por las autoridades con facultad para ello y con motivo de la situación de guerra en que nos encontramos, la práctica de un oscurecimiento; sobre el de haber entrado el juez querellado con Ignacio Saavedra al restaurante "La Greca" poco antes del oscurecimiento y sobre el de haber surgido una controversia porque la luz permaneció encendida en la mesa que ocupaba el juez, no hay cuestión. Es sobre los detalles, sobre la conducta del juez, que la contradicción existe.

Escuchamos declarar a los testigos y hemos vuelto a examinar sus testimonios y nuestra razón y nuestra conciencia nos llevan a resolver el conflicto en contra del querellado. Creemos que los testigos Luis A. Rosado, M. A. Díaz, A. Vilanova, e Iris Agostini dijeron substancialmente la verdad.

Luis A. Rosado, policía insular destacado para prestar servicios en la noche del diez de diciembre en la calle Muñoz Rivera, esquina a Peral, Mayagüez, donde se encuentra "La Greca" perteneciente a M. A. Díaz, declaró que tuvo que intervenir con el juez querellado con motivo del oscurecimiento. Antes del mismo, Díaz salió del restaurante y le anunció que iba a tocar la sirena. Recomendó al cabo de la "home guard" que fuera al establecimiento. Él permaneció fuera.

"Al tocar la sirena se apagó todo el pueblo de Mayagüez y en el restorán La Greca permanecía una luz prendida que daba resplandor a la calle. La gente protestaba, tiraba piedras, daba con palos en las puertas; se aglomeró mucha gente y yo como policía insular tuve que intervenir con la gente para que se dispersaran; no lográndolo, pues al cabo de la 'home guard' que estaba conmigo yo le dije: "Vaya usted dentro y diga que apaguen la luz." Visto que el cabo de la 'home guard' no podía apagar la luz, yo abandoné la gente y

me dirigí donde el Lic. Francisco Navarro Ortiz y le dije: 'Licenciado, ya tocaron la sirena hace más de quince minutos; el público está protestando y la gente me está tratando de negligente, y yo no quiero que se me trate de negligente. Yo quiero, con todo el respeto que usted se merece de mi parte, que me complazca.' A lo que él contestó que esa luz no se veía ni a veinte pies de distancia. Entonces está conmigo el cabo de la 'home guard' que yo entré en auxilio de él y el señor Saavedra, ya molesto con la presencia del cabo de la 'home guard,' le dijo que ellos estaban acatando órdenes muy severas y que ése no era terreno que él tenía que pisar, que si él se creía con alguna ·autoridad que los arrestara.' El cabo me dijo: 'Arrésteme este hombre,' y yo le dije: 'Vamos a tener calma, que yo voy a conseguir esto en una forma que no vaya a crear una situación más grave.' Entonces insistimos otra vez en que esta gente saliera y se apagara la luz. Entonces saqué a estos señores del establecimiento. . . . El Lic. Francisco Navarro Ortiz y el señor Saavedra; . . .''

Dijo también el policía que cuando entró al restaurante, el juez y Saavedra estaban tomando. Uno de los abogados del querellado le mostró· la copia del informe policíaco que luego introdujo en evidencia y el testigo dijo: ''Yo no reconozco esto como el informe que yo hice.'' En el que hizo ''relaté los hechos.''

M. A. Díaz declaró que el juez y Saavedra llegaron a su establecimiento como a las ocho de la noche del 10 de diciembre de 1941 y dijeron que iban a comer. Pidieron tres ''highballs'' que les sirvió. Habló con el policía Rosado y le dijo ''que a la hora que él quisiera podía pasar dentro del establecimiento para así de una manera u otra informara de qué manera íbamos a apagar la luz.''

Manifestó que tocada la sirena anunciando el oscurecimiento, dejó ''un pedacito de vela prendido· para que el señor Navarro y el señor Saavedra terminaran de comer'' y surgió una protesta del público que gritaba y tocaba las puertas, duro. La luz pudo estar encendida de cinco a diez minutos. Llamó al policía y los señores Navarro y Saavedra

salieron "después que entró el policía y un guardia local que les hizo saber la protesta del público."

A. Vilanova, cabo de la Home Guard, encargado de patrullar con cinco hombres la parte de la ciudad en que estaba "La Greca," manifestó:

". . . Díaz vino hasta donde nosotros y preguntó 'quién es el cabo?' y le dije 'yo' y me dice 'usted quiere acompañarme al establecimiento, tengo unos señores en una mesa y precisamente no podré apagar las luces, o sean las bombillas.' Entonces yo llegué con él hasta el establecimiento y al llegar encontré tres sujetos, tres señores, uno el Lic. Navarro Ortiz, otro de apellido Saavedra, que no conozco, y otro un oficial del cuerpo de bomberos de Mayagüez, que precisamente no recuerdo el nombre, pero es Torres Córdova. Este último al llegar yo a la mesa me dice en una forma como tratando de jugar conmigo: 'Ud. conoce a esos señores,' como intimidándome, 'sí, señor, el Juez de la Corte de Distrito y a este otro no tengo el honor'; y entonces el Sr. Saavedra me dice 'caramba yo no creí que en Mayagüez había una compañía tan bien preparada como ésta; ustedes tienen sus oficiales y ¿cómo se llaman?' contesté 'Luis Muñiz y Jaime Alcover Arrillaga'. Soltando al Sr. Saavedra me dice el Sr. Navarro Ortiz: 'dígame Ud. no sabe que la Ley Marcial no está decretada todavía en Puerto Rico?' y le dije: 'sí, señor, tiene razón, pero si está a mano del Gobernador la puede decretar en cualquier momento que la crea necesaria.' 'Nosotros tenemos una orden del Departamento de la Guerra y hay que hacerla cumplir; por tanto, les ruego que tan pronto como suene la sirena apaguen las luces.'

"P. ¿Tuvo usted que intervenir con ellos esa misma noche?

"R. Como veinte minutos después yo tenía cuatro hombres a mi custodia y subí patrullando cierta parte de la población que estaba a mi cargo y al llegar al establecimiento 'La Greca' encontré que era un escándalo aquello, y seguida el Sr. Tuto Díaz volvió y me insinuó para que fuera. Fuí y me encontré con una discusión y le dije 'llame a la policía para eso, yo no puedo hacer más nada, las luces están apagadas,' y me dijo: 'pero es que eso no puede seguir así' y fuí y al entrar la segunda vez el Sr. Saavedra en un estado un poco encolerizado, cogiendo la silla en esta forma, y yo hice así porque creía que me iba a dar. Él le dijo al policía 'arreste a este hombre que está pisando un terreno que no le conviene.' Es claro, el policía no lo hizo, y me dijo: 'usted está en cumplimiento de su deber y yo tengo el derecho de protegerlo; tenemos que estar con

ustedes para protegerlos en cualquier momento.' Entonces el Sr. Navarro Ortiz dice: 'señores, si esta luz no se ve ni a 20 pies fuera del establecimiento. Como ustedes están comidos, qué les importa que nosotros no lo hayamos hecho?' Entonces yo le contesté: 'Yo lamento muchísimo que ustedes no hayan comido, cuando la isla entera de Puerto Rico tiene conocimiento que esta noche se llevaría a efecto un oscurecimiento en la Isla.' . . . ''

Por último, Iris Agostini dijo que había entrado a ''La Greca'' en la noche del suceso como a las ocho y veinte a comprar unos pasteles, y allí vió al ''Lic. Francisco Navarro Ortiz: estaba en una mesa con dos señores más, en una esquina, estaban comiendo y bebiendo. El Lic. Navarro Ortiz me dirigió la palabra inmediatamente, 'Oye, linda, ven para que comas con nosotros,' '' y ''trató de pararse, trató, pero no se paró, . . . bueno, por su estado de embriaguez.''

Dejando esos testimonios hablar por sí mismos, sin adición de comentario alguno, se llega a la inevitable conclusión de que el hombre que se conduce como se condujo el querellado en el restaurante ''La Greca'' en la noche del diez de diciembre de 1941, no está capacitado para desempeñar el puesto de juez en la comunidad.

6. La práctica de evidencia con respecto al sexto cargo que consiste en la demostración de ineptitud que el querellante alega que demuestra el gran por ciento de sentencias dictadas por el juez querellado que este Tribunal Supremo revocó en apelación, quedó en suspenso por orden del tribunal. No será necesario reabrir la investigación. La prueba de los otros cargos, como acabamos de ver, es suficiente.

Ordenó el legislador en el párrafo primero de la sección tercera de la Ley Núm. 58 de 1930 ya citada, que cualquiera de los jueces de distrito de la Isla a quien se acusare de ''haber incurrido en prevaricación, soborno, conducta inmoral, negligencia inexcusable o ineptitud manifiesta para el desempeño de sus funciones, deberá ser destituído por el Gobernador de Puerto Rico a recomendación del Tribunal Supremo,'' previos los trámites que el mismo estatuto fija.

Aquí se acusó al juez querellado de conducta inmoral, negligencia inexcusable e ineptitud manifiesta, se siguieron los trámites de ley y se practicó la evidencia con el resultado que dejamos expuesto.

Seis cargos formuló contra el querellado el Procurador General. Luego adicionó cuatro al primero y dos al segundo. Cinco de los cargos con sus adiciones quedaron substanciados ante esta propia corte. Algunas de las adiciones por sí solas no constituirían base suficiente para la destitución. Todas, sin embargo, se entrelazan y militan con mayor o menor fuerza en contra del querellado. Entre los cinco cargos, el segundo, el tercero y el quinto son de tal gravedad que imponen como consecuencia inescapable la destitución. Serios por sus implicaciones son también el cuarto y el primero.

La obra de jueces competentes, diligentes y morales es absolutamente necesaria en las cortes de distrito para que la judicatura conserve su prestigio, inspire confianza y realice su misión, para administrar justicia a todos por igual con prontitud y acierto. Y el juez querellado por sus actos se ha colocado fuera de ese plano de acción.

La prueba demuestra más allá de duda razonable que dicho juez querellado, Francisco Navarro Ortiz, Juez de la Corte de Distrito de Mayagüez, es culpable de la conducta inmoral y de la negligencia inexcusable en el desempeño de su cargo de que fué acusado y *debe, por tanto recomendarse al Gobernador de Puerto Rico, de acuerdo con la ley, su destitución.*